SENECA NATION OF INDIANS
PEACEMAKERS' COURT
ALLEGANY TERRITORY

SENECA DEVELOPMENT, LLC,

Plaintiff,

vs.

OPUS CONSULTING PARTNERS, LLC; DUGGAN & DUGGAN GENERAL CONTRACTOR, INC.; MJ MECHANICAL SERVICES, INC.; TRANE U.S., INC.; IMEG CONSULTANTS CORP. f/k/a IMEG CORP.; VPH ENGINEERING SERVICES, P.C.; MICHAEL J. HULTS, P.E.; VERVE DESIGN STUDIO, INC.; and RHYTHM CULTIVATION SOLUTIONS AND SERVICES, LLC,

Defendants.

**COMPLAINT**

Civil Action No. ___________________

Plaintiff Seneca Development, LLC, by its attorneys Harter Secrest & Emery LLP and Legal Department of the Seneca Nation of Indians, as and for its Complaint against the defendants, Opus Consulting Partners, LLC; Duggan & Duggan General Contractor, Inc.; MJ Mechanical Services, Inc.; Trane U.S., Inc.; IMEG Consultants Corp. f/k/a IMEG Corp.; VPH Engineering Services, P.C.; Michael J. Hults, P.E.; Verve Design Studio, Inc.; and Rhythm Cultivation Solutions and Services, LLC (collectively, "Defendants"), states and alleges as follows:

## SUMMARY OF CLAIM

1. This is a proceeding for breach of contract, professional negligence, and related claims arising from a real property improvement (the "Project") to renovate and convert an existing industrial building for use as a controlled environment agriculture facility now known as the Oil Springs Nativa Cannabis Cultivation Facility (the "Facility"), located at 9962 NY Route 446 in

**Exhibit A**

Cuba, New York, on real property which is owned by the Seneca Nation of Indians in restricted fee status and leased to Plaintiff.

2. Plaintiff retained, directly or indirectly, the Defendants named herein to furnish consulting, design, and/or construction work and services for the Project. In particular, Plaintiff relied heavily upon its consultant, Opus Consulting Partners, LLC, which touted its specialized knowledge and experience in the cannabis cultivation industry, and whom Plaintiff paid over $2,000,000.00. Plaintiff also relied upon Duggan & Duggan General Contractor, Inc. as its construction manager, which coordinated and executed the critical build phase of the Project, and whom Plaintiff paid over $4,000,000.00 for the Project.

3. The Defendants' work and services were defective and improper with respect to the Project's mechanical systems, including the heating, ventilation, air conditioning and dehumidification ("HVACD") systems and equipment, which are materially defective and deficient, do not function properly for their intended purpose, and have caused significant damages to Plaintiff in a sum presently estimated to be $2,000,000.00, as is further explained herein.

**PARTIES**

4. Plaintiff Seneca Development, LLC ("Plaintiff") is a wholly owned limited liability company of the Seneca Nation of Indians, a federally recognized sovereign Indian nation.

5. Defendant Opus Consulting Partners, LLC ("Opus") is a foreign limited liability company resident in the State of Maine with a principal place of business at 770 Congress Street, Portland, Maine 04102.

6. Defendant Duggan & Duggan General Contractor, Inc. ("D&D") is a corporation resident in New York State with a principal place of business at 3113 North 7th Street, Allegany, New York 14706.

7. Defendant MJ Mechanical Services, Inc. ("MJ Mechanical") is a foreign business corporation resident in the State of Virginia which maintains an office for the regular conduct of business in New York State at 95 Pirson Parkway, Tonawanda, New York 14150.

8. Defendant Trane U.S., Inc. ("Trane") is a foreign corporation resident in Delaware with an office for the regular conduct of business at 45 Earhart Drive, Suite 103, Buffalo, New York 14221.

9. Defendant IMEG Consultants Corp., f/k/a IMEG Corp., is a corporation resident in New York with a principal place of business at 623 26th Avenue, Rock Island, Illinois 61201.

10. Upon information and belief, at times relevant herein, IMEG Consultants Corp. operated as IMEG Corp, a Missouri corporation, which merged into IMEG Consultants Corp. on or about April 3, 2023, and therefore IMEG Consultants Corp. ("IMEG"), as the surviving corporation, is the proper party to this proceeding.

11. Defendant VPH Engineering Services, P.C. ("VPH") was a professional service corporation which, upon information and belief, was formerly resident in New York State and maintained a principal place of business at 623 26th Avenue, Rock Island, Illinois 61201, and dissolved as of July 8, 2025, upon filing a certificate of dissolution with the New York State Department of State.

12. Defendant Michael J. Hults, P.E. ("Hults") is an individual who, upon information and belief, resides in Suffolk County, New York, and who, at all times relevant herein, was licensed as a professional engineer by the State of New York and furnished professional engineering services to the Project.

13. Defendant Verve Design Studio, Inc. ("Verve") is a foreign corporation resident in Missouri with a principal place of business at 1558 S. Broadway, St. Louis, Missouri 63104.

14. Defendant Rhythm Cultivation Solutions and Services, LLC is a limited liability company organized under the laws of the State of Colorado with its principal office at 7529 Pebble Drive, Fort Worth, Texas 73118.

15. Upon information and belief, each of the Defendants transacted business with, or for the benefit of, Plaintiff within Seneca Nation Territory, or otherwise transacted business for the benefit of Plaintiff and the Seneca Nation of Indians at all times relevant herein.

## JURISDICTION AND VENUE

16. Jurisdiction over the Defendants is properly exercised pursuant to Section 2-105 of the Seneca Nation of Indians Civil Practice Rules ("CPR") because the Defendants transacted business to supply goods or services within the Seneca Nation Territory.

17. Jurisdiction over the subject matter of this Action is properly exercised pursuant to CPR 2-107 because the facts and circumstances giving rise to the claims in this matter occurred within the territorial jurisdiction of the Seneca Nation of Indians and involve issues of Seneca Nation law.

18. Venue is properly fixed on the Allegany Reservation pursuant to CPR 3-102.

## FACTS AND CIRCUMSTANCES GIVING RISE TO THE ACTION

19. The Defendants named herein each supplied certain services, labor, materials and/or equipment to the Project, which began in late 2021 and for which construction work on the Facility was not completed until the fall of 2024.

20. Within months of Plaintiff commencing operations at the Facility, serious problems began to emerge with its mechanical systems, which prevented Plaintiff from being able to properly adjust and control the temperatures, humidity levels, and other environmental parameters within the Facility.

21. Plaintiff discussed these serious problems with the various Defendants, each of whom had participated in the Project, including without limitation by consulting, advising, designing, supplying, furnishing, installing, constructing, commissioning, calibrating, inspecting, approving and/or adjusting the Project's mechanical systems, although the Defendants were unable or unwilling to resolve the problems with the HVACD systems despite their initial attempts at troubleshooting, and the serious problems persisted.

22. Because of Defendants' failure to resolve the problems with the HVACD systems, Plaintiff retained a professional mechanical engineering consulting firm, Megerson Bandel Professional Engineers ("MBPE"), whose personnel conducted a site visit to the Facility on May 15, 2025 to evaluate the HVACD systems, determine the adequacy thereof, and propose remedial measures for the problems intended to allow the HVACD systems to function properly for the intended purpose.

23. This resulted in MBPE issuing a written report dated June 2, 2025 (the "MBPE Report"), a true and correct copy of which is attached as **Exhibit A**.

24. The MBPE Report describes a number of serious, pervasive issues and problems with the Facility's mechanical systems, including but not limited to the selection and use of non-integrated controls, lack of a centralized master HVACD control system, imprecise or improperly-sized humidification equipment, rooftop units ("RTU's") designed for intermittent use rather than continuous "24-7" operation needed for cannabis cultivation, and other concerns, with MBPE ultimately concluding that the mechanical system, as designed and constructed, is not suitable for the growing application required by Plaintiff. (See Exhibit A). In particular, the MBPE Report highlighted the following concerns with the Facility's newly installed mechanical system:

a. The use of "decoupled" mechanical systems, which is typically effective only for smaller cultivation areas, but less effective and efficient for "more expansive grow facilities, such as those observed at the Oil Springs Facility." (Exhibit A, p. 3).

b. The co-location of supply and return air pathways in the ceiling, which "creates a significant potential for supply air to be directly drawn into the return air stream, a phenomenon known as 'short circuiting'...," resulting in the HVACD system "failing to effectively cool or dehumidify the plant canopy." (Id., p. 4).

c. The use of standalone, supplemental dehumidifiers within the Facility's row rooms, "indicating that the primary Roof Top Units (RTUs) are not adequately capable of maintaining the desired humidity levels on their own. (Id., p. 5).

d. Use of single-walled RTUs with minimal insulation, which is a design feature "highly susceptible to internal condensation" in the high-moisture environment of the Facility, which creates "an ideal breeding ground for mold and mildew growth." (Id., p. 7).

e. The use of indirect heat exchangers in the RTUs, requiring the heating system to operate "by running the burner at maximum capacity" to reach designated temperatures, delaying the time the units modulate heating capacity, which "causes the space temperature to overshoot the target," resulting in "temperature fluctuation [that] can negatively impact the stability of the cultivation environment." (Id.).

f. The "critical deficiency" in the ability of the installed units to "precisely control the supply air temperature delivered to the cultivation space," resulting in delivery of excessively low temperature air that "creates the potential for inconsistent temperature distribution within the grow area, leading to the development of cold and hot spots and undesirable canopy microclimate." (Id.).

g. Use of a direct expansion refrigeration system, which require the compressors to continuously cycle on and off, leading to "significant swings in both temperature and humidity, which are detrimental to plant health and development." (Id.).

h. The use of RTUs primarily intended for commercial office building applications with intermittent operations schedules, rather than the "continuous 24/7 operation required for indoor cannabis cultivation," requiring continuous operation that "will place significantly higher stress on their components, leading to a reduced useful life expectancy." (Id., p.9). The Report further explained that premature compressor failures in the existing equipment presents "a significant concern that could occur within the next few years or sooner." (Id.).

i. The lack of an HVACD master control system and instead using a system which "lacks the precision required for optimal cannabis cultivation." (Id., p. 10).

25. Given the aforementioned concerns and others mentioned in the MBPE Report, MBPE has concluded that the mechanical systems installed at the Facility are "fundamentally ill-

suited for the precise demands of controlled agriculture environments", and that MBPE does "not foresee any viable path to effectively adapt or optimize the existing equipment to achieve the necessary levels of environmental control required for successful cultivation." (Exhibit A, p. 11).

26. Plaintiff therefore will be required to replace or materially revamp the HVACD system in order to achieve proper functionality required for cannabis growing operations, at significant expense, which it now seeks to recover against the Defendants herein.

## PROJECT HISTORY

27. On or about January 24, 2022, Plaintiff and Opus entered into a Standard Consulting Agreement and Amendment ("Opus Agreement"), a true and correct copy of which is attached as **Exhibit B**.

28. The Opus Agreement incorporated a Proposal dated November 17, 2021, from Opus to Plaintiff, pursuant to which Opus was to provide professional consulting services relative to the development and operation of the Project. (See Exhibit A).

29. Opus thereafter undertook to perform various consulting services over the next two years for which it was compensated by Plaintiff in excess of $2,000,000.

30. Among its obligations under the Opus Agreement, Opus was to "advise architects, engineers and construction companies to ensure design and construction are optimal for varied industry specific retail- and production-related processes and workflows."

31. Upon information and belief, Opus provided certain initial Project specifications, including the parameters for temperature and humidity conditions, to be used in the mother, flowering, vegetative, drying, cloning, and curing rooms.

32. On April 18, 2022, Trane U.S., Inc. ("Trane") sent a qualifications letter to Opus requesting to be a "team member that provides conditioned air system(s) expertise, equipment &

controls, installation services and ongoing support of the life of the" Project. A true and correct copy of this letter is attached as **Exhibit C**.

33. Trane stated in the letter that, if selected as a Project team member, it would "review individual space environmental conditioning requirements with Opus Consulting," and "[b]ased on the design parameters, [it] would calculate loads; dehumidification, reheat and cooling for each zone," thereby allowing Trane to make mechanical equipment selections and develop a Project budget. (See Exhibit B).

34. On April 19, 2022, Opus sent a confidential memorandum to the "Seneca Development Board" which discussed the Project and made recommendations for the Board to approve retaining various construction contractors for the Project work, including Defendants D&D and Trane. In the memorandum, Opus emphasized that cannabis cultivation facilities have "unique HVAC needs," and that "HVAC is one of the most critical aspects of indoor cultivation operations as systems that are inadequate will enable microbiological contamination and proliferation rendering a crop as unusable."

35. In May 2022, Opus prepared a confidential draft "Master Document" for approval of the "Seneca Development Board," which discussed the proposed Project team, goals, timing, and overall specifications, including temperature and humidity levels to be maintained in each of the various rooms comprising the Project facility. Therein, Opus recognized that the HVACD systems "for the cultivation related rooms is an area of extreme importance. **Without proper HVAC/D equipment in place, the operation will be destined for failure**. Moreover, these rooms have unique HVAC/D needs given the amount of moisture in these rooms at any given time coupled with the relatively high tolerances for optimal plant health." (Emphasis supplied).

36. On June 22, 2022, Trane sent a letter to the Seneca Nation of Indians offering to proceed with a Project Development Agreement ("PDA") for various Project-related work and service, including but not limited to the following: "Determine HVAC loads for the growing, processing, packaging and employee areas based on OPUS space condition specifications…Select HVAC equipment applicable for each of the individual zones considering cost, efficiency, reliability/serviceability and equipment availability (production lead time)…Prepare HVAC schematics for each of the individual areas to allow for installation pricing of selected equipment." A copy of this letter is attached as **Exhibit D.**

37. In its letter to the Seneca Nation, Trane proposed to develop a final Project Implementation Agreement ("PIA"), although Plaintiff is unaware if Trane submitted a final PIA.

38. On August 16, 2022, D&D and Plaintiff entered into a Construction Management Agreement ("CMA"), whereby D&D agreed to serve as the Project's Construction Manager ("CM"). A true and correct copy of the CMA is attached as **Exhibit E**.

39. Plaintiff retained Verve as the Project Architect pursuant to a separate agreement, which required Verve to furnish professional design, plans, and specifications for the Project.

40. Upon information and belief, D&D retained IMEG, VPH, and/or Hults to furnish certain aspects of the professional design for the Project, and in particular design for the mechanical systems and HVACD equipment based upon the design parameters discussed with or provided by Opus or other Project participants and was further responsible to furnish construction plans and specifications for the Project.

41. On February 9, 2023, Rhythm sent a written proposal to Opus proposing to provide certain fertigation and environment management systems for the Project, including but not limited to integration with the HVACD system. A copy of the Rhythm proposal is attached as **Exhibit F**.

42. Thereafter, Plaintiff retained Rhythm to furnish the proposed services for the Project.

43. Upon information and belief, D&D retained MJ Mechanical as a mechanical subcontractor to furnish certain labor, material, equipment and services to supply, install, and construct the mechanical systems for the Project.

44. Upon information and belief, MJ Mechanical held itself out as an expert in mechanical and HVACD design and installation, and promised in its April 18, 2022 written proposal to D&D that its "team of experts" would "be involved in all aspects of [the Project], from design, through installation, to the ultimate long term successful operation and maintenance of the systems."

45. Defendants undertook to perform their various services and work as alleged above for the planning, design, construction, installation, fit-out, and commissioning of the Project or relevant portions thereof.

46. Upon information and belief, the Project was substantially complete in approximately September of 2024, at which time Plaintiff undertook to commence growing and production operations at the facility, which required specific indoor air temperatures and humidity levels, as well as the ability to accurately control the same by use of the installed HVACD equipment and controls.

47. Within months of commencing growing and production operations, Plaintiff discovered that the HVACD equipment and controls that were designed, furnished, constructed, installed, configured, and/or calibrated by the Defendants were maladapted for the cannabis growing and production operations of the Project facility, and would not allow Plaintiff to

accurately control the temperature and humidity levels necessary for the plants to grow and develop properly, resulting in decreased or destroyed crop yields.

48. In addition, the mechanical systems frequently malfunctioned or suffered other failures, including without limitation events causing excessive heat, excessive condensation or other extreme conditions (for example, introduction of mold or other pathogens into the controlled growing environment), causing failure of plant crops, and a significant loss of product and revenue.

49. Plaintiff promptly and frequently communicated the HVACD system issues and problems to Defendants, as the relevant Project participants, to troubleshoot the issues and request remedial action, although Defendants did not provide any definitive cause for the system deficiencies and did not undertake to remediate the deficiencies in a way that would enable use of the facility as intended.

50. Plaintiff later retained MBPE and learned of serious issues with the mechanical systems as set forth in the MBPE Report (Exhibit A), which concluded that the mechanical systems cannot be remedied by simple repairs, but instead require a complete overhaul, which essentially will require that Plaintiff scrap the current HVACD system and equipment and install a new system that is properly designed for the intended cannabis-growing operations and will allow for suitable environmental controls without the damage to plant crops that is currently plaguing their operations.

51. Defendants have failed and refused to take remedial measures, thus requiring that Plaintiff retain third parties to properly design and construct mechanical systems that are reasonably suited to the Project's intended application at significant additional cost.

**FIRST CAUSE OF ACTION:**
**BREACH OF CONTRACT**
***Against Defendants Opus, D&D, Rhythm, and Verve***

52. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

53. The Opus Agreement between Plaintiff and Opus constituted a valid contract binding and in effect between Plaintiff and Defendant Opus.

54. Opus materially breached the Opus Agreement by providing inadequate, faulty, deficient, and defective consulting services and professional advice with respect to the design and construction of the Project facility, which has proximately caused damages to Plaintiff in an amount to be determined at trial, but which is estimated to be approximately $2,000,000.00.

55. The CMA between Plaintiff and D&D constituted a valid contract binding and in effect between Plaintiff and D&D.

56. D&D materially breached the CMA by providing inadequate, faulty, and defective design and construction services with respect to the Project facility, which has proximately caused damages to Plaintiff in an amount to be determined at trial, but which is estimated to be approximately $2,000,000.00.

57. Plaintiff and Trane entered into a valid and binding contract, which Trane materially breached by failing to provide adequate design and construction services and by furnishing unsuitable, defective, and otherwise improper mechanical equipment, which has proximately caused damages to Plaintiff in an amount to be determined at trial, but which is estimated to be approximately $2,000,000.00.

58. Plaintiff and Rhythm entered into a valid and binding contract, which Rhythm materially breached by failing to provide adequate design and construction service, including by failing to provide suitable HVACD system integration and controls or otherwise furnishing unsuitable, defective, and/or improper equipment or components for the HVACD systems, which

has proximately caused damages to Plaintiff in an amount to be determined at trial, but which is estimated to be approximately $2,000,000.00.

59. Plaintiff and Verve entered into a valid and binding contract whereby Verve was to furnish architectural and other professional design services, including a cohesive set of plans and specifications for the construction of the Project, although Verve materially breached its contract by failing to provide suitable and adequate design services, resulting in damages to Plaintiff in an amount to be determined at trial, but which is estimated to be approximately $2,000,000.00.

**SECOND CAUSE OF ACTION:**
**RECOUPMENT/UNJUST ENRICHMENT**
***Against Defendants Opus, D&D, Rhythm, and Verve***

60. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

61. Plaintiff conferred a benefit upon Defendants Opus, D&D, Rhythm, and Verve, each of whom was enriched by the benefits so conferred, for which Plaintiff expected to, but did not, receive in exchange good and valuable consideration from such Defendants, such that it would violate the principles of equity and good conscience to permit Defendants to retain such benefits.

62. Therefore, Plaintiff is entitled to recoupment and reimbursement, in whole or part, with respect to any benefits conferred upon, or payments made to, the said Defendants upon the equitable principles of recoupment or unjust enrichment, in an amount to be determined, estimated to be approximately $2,000.000.00.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
***Against All Defendants***

63. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

64. Defendants improperly designed, supplied, constructed, commissioned, approved, and/or configured the Project facility's mechanical systems or components thereof, such that the systems cannot be operated in a manner suitable for the intended use of the Project facility.

65. Defendants had a duty to Plaintiff, as the Project owner, to use reasonable skill, care and diligence in carrying out their obligations for the design, construction, configuration, and related services relative to the Project's HVACD systems.

66. Defendants have materially breached their duty of care, proximately causing damages to Plaintiff in an amount to be proven at trial, estimated to be approximately $2,000,000.00, for which Defendants should be held liable, jointly and severally, or alternatively, in proportion to their degree of fault for such damages.

**FOURTH CAUSE OF ACTION:**
**PROFESSIONAL NEGLIGENCE**
***Against Defendants Opus, Verve, IMEG, VPH, and Hults***

67. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

68. Defendants Opus, Verve, IMEG, VPH, and Hults each held themselves out as professionals in their areas of expertise, and Plaintiff retained them on the basis of their represented unique knowledge to furnish certain services to Plaintiff for the benefit of the Project.

69. Upon information and belief, the said Defendants agreed to furnish Plaintiff with advice and services to allow successful design and construction of the Project, including with respect to the HVACD systems and components thereof, and owed a duty to furnish their professional services in accordance with the skill, care, and attention typically required for professionals of a like specialty providing similar services on projects of a similar size, type and scope as the Project in a similar geographical location.

70. The said Defendants failed to carry out their professional duties with reasonable diligence in accordance with the required level of skill and care ordinarily exercised by professionals furnishing such services, and as a direct and proximate result of the negligent acts and omissions of the said Defendants, Plaintiff has been damaged in an amount to be proven at trial, estimated to be approximately $2,000,000.00, for which Defendants should be held liable, jointly and severally, or alternatively, in proportion to their degree of fault for such damages.

**FIFTH CAUSE OF ACTION:**
**BREACH OF EXPRESS WARRANTY**
***Against Defendants D&D, Trane, and MJ Mechanical***

71. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

72. The CMA between D&D and Plaintiff included express warranty provisions in Article VIII thereof.

73. In Articles 8.1 and 8.2 of the CMA, D&D made various representations and warranties to Plaintiff, including as follows:

a. that D&D "has all the requisite. . . power and authority to enter this Agreement and perform its obligations hereunder";

b. that D&D "has substantial experience, knowledge and professional competence in the procurement, project management and construction management of projects similar to the Project"; and

c. that D&D "is fully experienced properly qualified and properly licensed, equipped and organized to perform the Work."

74. In Article 8.3 of the CMA, D&D further warranted that the Project Work "…will be of high quality, free from Defects and in specific conformity with this Agreement," that the "Work will be performed and the Project will be completed in accordance with the requirements

of this Agreement," that the "Work will comply with all applicable building codes and standards, and will have successfully passed all usual and customary tests, inspections and approvals required or recommended in accordance with sound construction practices." (See Exhibit E, Art. 8.3(a)).

75. Defendant D&D further warranted and represented in the CMA that it "shall be required to repair, correct, refinish, or if insufficient, to re-perform the Work (including removal and replacement), and generally take or cause to be taken such actions as may be required, to fully remedy ("**Repair**") any Defects discovered during the Warranty Period at no cost to Owner. The cost to Repair any Defect shall not be part of the Contract Price." (Id.)

76. D&D further promised that it would obtain similar warranties required by the CMA from all Contractors perform any Project Work for D&D for a similar "Warranty Period," that being defined as one year from Substantial Completion of the Project. (Id. at Art. 8.4; 8.5).

77. Within the Warranty Period, Plaintiff notified D&D of material "Defects" in the Project Work, which required "Repair" in accordance with the CMA's warranty provisions, including without limitation deficient performance of the HVACD systems; however, D&D, and the other "Contractors" whom it retained to furnish certain portions of the Work, failed and refused to honor the warranty by providing suitable "Repairs" for the "Defects," thereby causing damages to Plaintiff for which D&D is liable in an amount not less than $2,000,000.00, or such other amount as may be proven at trial or hearing resulting from the breach of D&D's warranty.

78. Upon information and belief, defendant Trane furnished a written warranty to Plaintiff, warranting and representing its work and equipment for a period of one year from installation, within which period Plaintiff notified Trane of material defects therein and requested remediation, although said Defendant refused to repair, replace, or otherwise remediate the deficiencies in its equipment, in breach of said Defendant's warranty, thereby causing damages to

Plaintiff for which said Defendant is liable in an amount as may be proven at trial or hearing, estimated to be approximately $2,000,000.00.

79. Upon information and belief, defendant MJ Mechanical furnished a written warranty to Plaintiff, or to D&D for the benefit of Plaintiff, warranting and representing its work and equipment for a period of one year from installation, within which period Plaintiff notified MJ Mechanical of material defects therein and requested remediation, although said Defendant refused to repair, replace, or otherwise remediate the deficiencies in its equipment, in breach of said Defendant's warranty, thereby causing damages to Plaintiff for which said Defendant is liable in an amount as may be proven at trial or hearing, estimated to be approximately $2,000,000.00.

## SIXTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY

***Against All Defendants***

80. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

81. Upon information and belief, to the extent any Defendant did not furnish an express warranty to Plaintiff, each Defendant furnished an implied warranty for its work, services, and/or equipment furnished to the Project, impliedly warranting that the Project components furnished were of merchantable quality and were fit for the ordinary and/or expected purpose.

82. Plaintiff advised the Defendants of the ongoing, material issues and problems with mechanical system operations, which indicated that the system and its components had not been of merchantable quality and/or were not fit for their ordinary and/or expected purpose.

83. Plaintiff demanded that the Defendants remediate and repair all issues therewith in accordance with the implied warranty, although the Defendants have failed and refused to remediate and address the material issues with the HVACD system and its components and thereby

violated their implied warranty obligations, causing damages to Plaintiff in an amount to be proven at trial, but which is estimated to be approximately $2,000,000.00.

**SEVENTH CAUSE OF ACTION:**
**FRAUDULENT MISREPRESENTATION**
***Against Defendants Opus, D&D, Trane, and MJ Mechanical***

84. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

85. Defendant Opus made one or more material misrepresentations of fact with respect to its anticipated work and services offered to Plaintiff for the Project, including without limitation the following: (a) Opus falsely held itself out as an expert in the cannabis cultivation and production industry; (b) Opus falsely promised to Plaintiff that it had the knowledge and ability to render its services for the Project in accordance with industry standards for projects of a similar nature; and (c) Opus falsely represented that it was properly licensed, authorized, and otherwise qualified to perform the scope of work and services which they promised to provide to the Project for the benefit of Plaintiff.

86. Defendant D&D made one or more material misrepresentations of fact to Plaintiff with respect to its anticipated work and services for the Project, including without limitation the following: (a) D&D falsely claimed it had the knowledge and expertise to perform and oversee all Project work, consisting of complex renovation of an existing facility and installation of a suitable HVACD system that would allow use of the facility for controlled environment agriculture; (b) D&D falsely promised that it would perform all Project work in an efficient, workmanlike and economically prudent manner and that it would use, and require all subcontractors to use, their best professional judgment in performance of Project work; and (c) D&D falsely promised and represented that it, and any subcontractors and consultants it retained to furnish part of the Project

work or services, would be properly licensed, authorized, and qualified to perform the work and services it promised to provide to Plaintiff.

87. Defendant Trane made one or more material misrepresentations of fact with respect to its anticipated work and services for the Project, including without limitation the following: (a) Trane falsely held itself out as an experienced mechanical equipment consultant and supplier of mechanical systems intended for use in controlled environment agriculture projects of the same type as the Project; (b) Trane falsely promised that it would "review individual space environmental conditioning requirements with Opus Consulting," and "[b]ased on the design parameters, [it] would calculate loads; dehumidification, reheat and cooling for each zone," and that it would make mechanical equipment selections and develop a Project budget; and (c) Trane falsely promised and represented that it was properly licensed, authorized, and qualified to perform the scope of work and services it promised to furnish to Plaintiff.

88. Defendant MJ Mechanical made one or more material misrepresentations of fact with respect to its anticipated work and services for the Project, including the following: (a) that MJ Mechanical had a team of experts very knowledge of HVAC systems intended for cannabis cultivation projects; (b) that MJ Mechanical's team of experts would be involved in all aspects of the Project, from design, installation, and beyond; and (c) that MJ Mechanical was experienced in the work at issue and fully capable of performing as a competent design-build HVACD contractor for the Project.

89. The said Defendants knew that their statements and representations were false or materially misleading when made and were made to induce reliance by the Plaintiff to gain an economic benefit.

90. The Plaintiff reasonably relied upon the false statements and misrepresentations by Defendants, which Plaintiff did not then know or have reason to know were false.

91. Given the false and materially misleading statements and misrepresentations made by the said Defendants, any contracts entered into between Plaintiff and said Defendants are voidable and Defendants may not rely upon any protective provisions, damages limitations, or other exculpatory language set forth therein to evade liability for damages caused by their actions.

92. As a result of such reasonable and good faith reliance upon the false statements and factual misrepresentations by the said Defendants, Plaintiff has suffered actual damages in an amount to be proven at trial, but which is estimated to be approximately $2,000,000.00.

## EIGHTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION
***Against Defendants Opus, D&D, Trane, and MJ Mechanical***

93. Plaintiff repeats and realleges the facts set forth above as if fully set forth herein.

94. Defendants Opus, D&D, Trane, and MJ Mechanical, each had a duty to Plaintiff by virtue of their special relationship as contractors, vendors, consultants, and/or professionals who promised to furnish services, work, materials and/or equipment to the Project for the benefit of Plaintiff.

95. The said Defendants made false or materially misleading representations of fact that they knew or should have known were incorrect when made, including the express or implied statements recited above in the Sixth Cause of Action.

96. The statements and representations made by Defendants were made negligently without regard for their truth or falsity and for the purpose of inducing the Plaintiff to transact business with them and retain them to provide the relevant services, work, materials, and/or equipment to the Project in exchange for economic benefit to the said Defendants.

97. Plaintiff reasonably relied upon the Defendants' negligent misrepresentations to its detriment, and as a result, suffered damages including the cost of damaged crops and purchase of mechanical equipment and related items that are unsuitable for use on the Project and which must be removed and replaced at significant cost and expense to Plaintiff, with the cost to be determined at trial, but which is estimated to be approximately $2,000,000.00.

**DEMAND FOR JUDGMENT**

98. Plaintiff respectfully requests that this honorable Court grant the relief sought in this Complaint and enter an Order and Judgment in its favor, and against the Defendants, as follows:

a. On the First and Second Causes of Action, awarding monetary damages in favor of Plaintiff and against Defendants Opus, D&D, Rhythm, and Verve in the amount of $2,000,000.00, or such other amount as is proven at trial;

b. On the Third Cause of Action, awarding monetary damages in favor of Plaintiff and against Defendants in the amount of $2,000,000.00, or such other amount as is proven at trial, jointly and severally, or in the alternative, in proportion to the degree of fault of each Defendant in causing the damages proven;

c. On the Fourth Cause of Action, awarding monetary damages in favor of Plaintiff and against Defendants Opus, Verve, IMEG, VPH, and Hults in the amount of $2,000,000.00, or such other amount as is proven at trial;

d. On the Fifth Cause of Action, awarding monetary damages in favor of Plaintiff and against Defendants D&D, Trane, and MJ Mechanical in the amount of $2,000,000.00, or such other amount as is proven at trial;

e. On the Sixth Cause of Action, awarding monetary damages in favor of Plaintiff and against all Defendants in the amount of $2,000,000.00, or such other amount as is proven at trial in proportion to the fault of each Defendant;

f. On the Seventh Cause of Action, awarding monetary damages in favor of Plaintiff and against Defendants Opus, D&D, Trane, and MJ Mechanical in the amount of $2,000,000.00, or such other amount as is proven at trial;

g. On the Eighth Cause of Action, awarding monetary damages in favor of Plaintiff and against Defendants Opus, D&D, Trane, and MJ Mechanical, jointly and severally, or in the alternative, in proportion to the degree of fault of each Defendant, in the amount of $2,000,000.00, or such other amount as is proven at trial; and

h. As to all Causes of Action, awarding to Plaintiff and against Defendants such other and further relief as this Honorable Tribunal deems necessary, equitable, and proper in the interest of justice.

Dated: September 22, 2025

Seneca Development LLC (Plaintiff)

By: ______________________
Trey Franey, General Manager

Dated: September 22, 2025

Seneca Nation of Indians

By: ______________________
Lee M. Redeye, Esq.*
Deputy Counsel
12837 Route 438
Irving, New York 14081
Telephone: 716-532-4900
Email: Lee.Redeye@sni.org

Dated: September 17, 2025

Harter Secrest & Emery LLP

By: ______________________
John G. Horn, Esq.
Jessica A. Myers, Esq.*
50 Fountain Plaza, Suite 1000
Buffalo, New York 14202
Telephone: 716-853-1616
Email: jhorn@hselaw.com
jmyers@hselaw.com

*Attorneys for Plaintiff,*
*Seneca Development, LLC*

**Application for Admission Pending*